**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SARA L.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20-cv-3098** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Sara L. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIBs"). The Commissioner brings a cross-motion for summary judgment seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons described herein, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #19), is granted and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #23), is denied.

**I.     BACKGROUND**

**A.     Procedural History**

On January 27, 2017, Claimant (then sixty years old) filed an application for DIBs alleging disability dating back to September 22, 2016, due to limitations stemming from dizziness, extreme fatigue, muscle weakness, difficulty concentrating, depression, sleep cycle

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

regulation disorder, insomnia, and gait issues.  (Administrative Record ("R.") 227).  Claimant's

application was denied initially and upon reconsideration.  (R. 15).  Claimant filed a timely

request for a hearing, which was held on December 18, 2018, before Administrative Law Judge

("ALJ") Lee Lewin.  (R. 38-77).  Claimant appeared with counsel and offered testimony at the

hearing.  A medical expert and a vocational expert also offered testimony.  On March 4, 2019,

the ALJ issued a written decision denying Claimant's application for benefits.  (R. 12-32).

Claimant filed a timely request for review with the Appeals Council.  The Appeals Council

denied Claimant's request for review on March 23, 2020, (R. 1-6), leaving the ALJ's decision as

the final decision of the Commissioner.  This action followed.

### B.    The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that she is disabled,

meaning she cannot "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death, or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or

profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability.  20 C.F.R. §404.1520(a)(4)(i).

At step two, the SSA determines whether a claimant has one or more medically determinable

physical or mental impairments.  20 C.F.R. §404.1521.  An impairment "must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically

acceptable clinical and laboratory diagnostic techniques."  *Id.*  In other words, a physical

2

or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If the claimant establishes that she has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), or her capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience. If such jobs exist, she is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

C.    **The Evidence Presented to the ALJ**

Again, Claimant seeks disability benefits due to limitations stemming from dizziness, extreme fatigue, muscle weakness, difficulty concentrating, depression, sleep cycle regulation disorder, insomnia, and gait issues. (R. 227). At the time she stopped working, Claimant had

3

acquired sufficient quarters of coverage to remain insured through December 31, 2022.  (R. 16).

She presented the following relevant evidence to the ALJ in support of her claim.

### 1.    Medical Evidence Related to Claimant's Mental Impairments

Claimant, who previously underwent sex reassignment surgery, began treating with

Emmanuel Perakis, M.D., a psychiatrist, on May 23, 2017.  During Claimant's initial evaluation,

Dr. Perakis noted that she had a long history of mental illness, including depression, sleep

dysregulation, and dysthymia, and has been in treatment for years.  (R. 578).  She took medical

leave from her job as a college professor in November 2016.  (*Id.*).  Claimant reported that she

was "doing relatively well" with her depression medications and described her depression

symptoms as "under better control."  (R. 579).  She denied any mania or psychotic symptoms.

(*Id.*).  Dr. Perakis often observed that Claimant had good insight, intact judgment, good

concentration, and intact memory, and noted no evidence of any formal thought disorder or

perceptual defects.  (*Id.*).  He diagnosed "severe episode of recurrent major depressive disorder,

without psychotic features."  (*Id.*).

On June 20, 2017, Dr. Perakis observed that Claimant was "doing relatively well."  (R.

576).  He noted that Claimant's major depression symptoms were in remission, but low-grade

level of depression persisted.  (*Id.*).  On August 25, 2017, Claimant reported that she was still

"overwhelmed with intense feelings of depression" in the mornings.  (R. 604).  Even so, she

denied mania or psychotic symptoms, and Dr. Perakis observed no evidence of thought disorder

or perceptual defects.  (*Id.*).  On November 13, 2017, Claimant informed Dr. Perakis that she had

increasingly become more depressed and was experiencing passive suicidal thoughts.  (R. 602).

At her next appointment, on December 12, 2017, Claimant's mental status exam was normal,

apart from a preoccupation with potential side effects of her medication. (R. 782). She was

having "more bad days than usual," so Dr. Perakis increased her prescription. (*Id.*).

On March 13, 2018, Claimant informed Dr. Perakis that "Dexedrine seems to be helping

her ability to focus and Wellbutrin XL is continuing to help the depression." (R. 784). She

denied any mood swings, irritability, or agitation, although she reported ongoing feelings of

depression. (*Id.*). Her mental status exam was normal apart from a preoccupation with needing

to find a new therapist. (*Id.*). Claimant's mood was "relatively stable." (R. 785). On June 12,

2018, Dr. Perakis noted that Claimant had been doing "relatively well" and had been "utilizing

some skills through therapy to get out of the house more frequently." (R. 920). Although

Claimant was struggling with sleep dysregulation, she reported no feelings of depression or

psychotic symptoms, and Dr. Perakis noted no evidence of formal thought disorder or active

perceptual defects. (*Id.*). He endorsed diagnoses of major depressive disorder "without

psychotic features," and again described Claimant's mood as "stable." (R. 920-21). Dr. Perakis

made similar observations on September 11, 2018. (R. 917).

Bonnie Whyte, Ph.D., began treating Claimant on February 23, 2017. (R. 911). On

November 16, 2017, Dr. Whyte wrote that Claimant "has a very negative attitude toward the

world and perceives emotional injury in most situations," most of which "appears to be

perceived rather than factual." (R. 909). On January 25, 2018, Dr. Whyte noted that Claimant

would not consider returning to a part-time accounting job because of her fear that people would

treat her poorly. (R. 905). On February 8, 2018, Dr. Whyte noted that Claimant was suffering

from delusions, including "struggling with reality testing regarding her financial future." (R.

904). She also observed that Claimant's delusion that she needs to sleep ten to twelve hours per

night prevented her from considering "reasonable options for self-support." (*Id.*) ("She contends that she simply cannot have any demands placed on her by people because of her fragility.").

A few weeks later, on February 22, 2018, Dr. Whyte noted that Claimant was experiencing persistent fleeting suicidal ideation, and an inability to function outside the home or normally due to her "delusional thought process." (R. 903). On March 15, 2018, Dr. Whyte again noted that Claimant believed that her illness and symptoms – including thoughts of persecution – barred her from participating in the world in a meaningful way. (R. 902).

Claimant also received therapy from Melissa Gonski, a licensed clinical professional counselor ("LCPC"), from July through November 2018. (R. 920-52). Ms. Gonski routinely noted that Claimant presented as oriented, with good insight. (R. 922, 924, 928, 930, 932). On August 2, 2018, Claimant reported that she was meeting an old friend for lunch. (R. 944). On August 13, 2018, Claimant reported that she was lonely and had gotten in touch with some old friends. (R. 942). On October 8, 2018, Claimant informed Ms. Gonski that one of her friends had come into town to celebrate her birthday, but had left early, upsetting Claimant. (R. 932).

Claimant began treating with Karen Beckstrand, Psy.D., in 2018. On April 16, 2018, Dr. Beckstrand noted that Claimant was "living as a recluse." (R. 964). However, she also noted that Claimant had recently attended a synagogue and had a "social evening." (R. 968-69).

### 2. Opinion Evidence from Claimant's Treating Physicians

Dr. Whyte wrote a letter on Claimant's behalf on November 27, 2017. (R. 775). Among other things, Dr. Whyte opined that Claimant: (1) is unable to sustain "work related or personal relationships;" (2) experiences delusions that "serve to restrict her daily movements and make employment an impossibility;" and (3) is unable to work due to "pervasive thought disorder as

6

well as major depressive symptoms which interfere with her ability to think and demonstrate effective cognitive versatility required in a work environment." (*Id.*).

Dr. Whyte also completed a mental RFC statement on Claimant's behalf on April 14, 2018. Therein, she opined that Claimant has no friends, has no social connections, and is unable to hold a job. (R. 911). She further found that Claimant has extreme limitations (precluding performance for fifteen percent or more of a workday) in every functional category but one (in which Claimant was only slightly less impaired). (R. 911-13). These categories include the ability to understand, follow, and carry out simple instructions; maintain concentration, persistence, or pace; sustain ordinary routine; work with others or perform without special supervision; interact appropriately with supervisors or the public; or adapt to changes in the workplace. Dr. Whyte opined that Claimant's delusional thought patterns and abnormal reactions to normal stressors would exacerbate her limitations. (R. 913-14). She concluded that Claimant would be off task for more than thirty percent of an average workday and absent from work more than six days per month. (R. 913).

Dr. Perakis completed a mental RFC statement on Claimant's behalf on April 17, 2018. He endorsed diagnoses of major depression, dysthymia, and sleep dysregulation, and described his prognosis as "guarded." (R. 778-81). Dr. Perakis' RFC included only slightly more moderate findings than Dr. Whyte's. He opined that Claimant has extreme limitations in most functional categories, including the ability to understand, follow, and carry out simple instructions; sustain an ordinary routine; work with others; perform without special supervision; interact appropriately with supervisors; and adapt to changes in the workplace. (R. 779-80). He also found that Claimant would be off task for more than thirty percent of the workday and absent from work more than six days per month. (R. 780).

Ms. Gonski, Claimant's treating counselor, also completed a report documenting Claimant's limitations. On August 1, 2018, Ms. Gonski opined that Claimant experiences anxiety when encountering other people, has difficulty going out in public, is easily flustered by stress, and experiences anxiety when leaving the house and driving to unfamiliar places. (R. 915). She further noted that Claimant's illness markedly restricts her daily activities, socialization, and the ability to sustain concentration and attention. (R. 915-16).

### 3. Evidence from State Agency Consultants

State agency psychological consultant Russell Taylor, Ph.D., reviewed Claimant's file on July 28, 2017. He found that Claimant has a mild limitation in interacting with others and no limitation in any other "paragraph B" category. (R. 94). State agency psychological consultant Howard Tin, Psy.D., reviewed Claimant's file at the reconsideration level, on January 10, 2018. Dr. Tin's findings mirrored Dr. Russell's, except he found that Claimant also has a mild limitation in her ability to understand, remember, or apply information. (R. 120-21).

State agency psychological consultant, Ryan Mendoza, Ph.D., reviewed Claimant's file on May 30, 2018, and provided a more detailed assessment of her mental RFC. He found Claimant to be moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; make simple work-related decisions; complete a normal workday and workweek; accept instructions and respond appropriately to supervisors; get along with coworkers; maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (R. 819-20). In all other categories, Dr. Mendoza found that Claimant is not significantly limited. (*Id.*). In light of these findings, he found that Claimant can understand and remember simple and low-level detailed tasks; sustain

the concentration, persistence, and pace needed to complete a normal workday and workweek; establish and maintain appropriate relationships, while having infrequent interactions with peers and supervisors and limited public interaction; and adapt to routine – not frequent or intense – workplace stress and changes.  (R. 821).

### D.    The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching the decision to deny Claimant's request for benefits.  At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date of September 22, 2016.  (R. 17).  At step two, the ALJ determined that Claimant suffers from the severe impairments of depression and anxiety with dizziness and intermittent headaches, as well as degenerative disc disease of the lumbar spine.  (R. 18).  At step three, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meet or medically equal one of the SSA's listed impairments, including 12.04 (depressive disorders), and 12.06 (anxiety disorders).  (R. 18).  In reaching this finding, the ALJ considered the four broad areas of mental functioning known as the "paragraph B criteria," and found that Claimant has a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, and maintaining pace; and a mild limitation in adapting or managing herself.  (R. 18-19).

 Before turning to step four, the ALJ determined that Claimant has the RFC to perform medium work with the following limitations:

> [S]he can occasionally climb ladders, ropes, and scaffolds; frequently stoop; must avoid concentrated exposure to loud noise and hazards including dangerous machinery and unprotected heights; she can remember, understand, and carry out instructions for simple, routine, repetitive tasks with sufficient persistence, concentration, or pace to timely and appropriately complete such tasks with no fast paced rate or strict quota requirements; she can adjust to routine workplace

changes; can make simple work-related decisions; can have occasional contact with coworkers, supervisors, and the general public; with no problem-solving tasks with the general public.

(R. 19-20). Based on this conclusion, the ALJ determined at step four that Claimant cannot perform her past relevant work as a university faculty member. (R. 25). Even so, at step five, the ALJ concluded that a sufficient number of jobs exist in the national economy that Claimant can perform given her age, education, work experience, and RFC, including the representative occupations of housekeeper cleaner and industrial cleaner. (R. 26). As such, the ALJ found that Claimant was not disabled from her alleged onset date through the date of the decision. (*Id.*).

## II.   STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th

10

Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to his or her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether a claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## III.     ANALYSIS

Claimant argues, among other things, that the ALJ improperly rejected the opinions of her treating mental health professionals, including that of her psychologist Dr. Bonnie Whyte. Because this argument has merit, the Court finds that a remand to the SSA is warranted and will not address Claimant's additional arguments. *See DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) ("Because we determine that the ALJ did not properly evaluate DeCamp's limitations . . . we do not address DeCamp's other arguments."). The Court's decision in this regard, however, is not a comment on the merits of Claimant's other arguments, which Claimant is free to assert on remand.

### A.     The ALJ's decision to discount the opinions of Dr. Whyte is not supported by substantial evidence.

It is well-settled that "an ALJ need not blindly accept a treating physician's opinion." *Schreiber v. Colvin*, 519 Fed.Appx. 951, 958 (7th Cir. 2013). However, for claims filed prior to March 27, 2017 (such as Claimant's claim here), the treating physician rule requires an ALJ to give a treating physician's opinion controlling weight only "if it is well-supported and not inconsistent with other substantial evidence." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *Givens v. Colvin*, 551 Fed.Appx. 855, 861 (7th Cir. 2013) ("An ALJ may discount even a

treating physician's opinion if it is inconsistent with the medical record."); *see also Luster v. Astrue*, 358 Fed.Appx. 738, 740 (7th Cir. 2010) ("an ALJ may reject a treating physician's opinion . . . if substantial evidence in the record contradicts the physician's findings."). When an ALJ rejects a treating source's opinion, "a sound explanation must be given for that decision," *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011), and courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment," *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Luster*, 358 Fed.Appx. at 740. Moreover, "[o]nce well-supported contrary evidence is introduced, . . . a treating physician's opinion becomes just another piece of evidence for the ALJ to evaluate." *Karr*, 989 F.3d at 511.

As explained above, Dr. Whyte, Claimant's treating psychologist , submitted, not one, but two opinions on Claimant's behalf. In the first – a November 27, 2017 letter – Dr. Whyte noted, in part, that Claimant is unable to sustain relationships and experiences delusions that "restrict her daily movements and make employment an impossibility." (R. 775). In the second – an April 14, 2018 RFC statement – Dr. Whyte opined that Claimant has an extreme limitation in every functional category but one. (R. 911-13). The ALJ afforded both opinions "little weight," finding them to be: (1) inconsistent with Dr. Whyte's own treatment notes because they "do not document psychotic signs or symptoms"; (2) inconsistent with the record of the conservative treatment Claimant received; (3) inconsistent with the treatment notes of Dr. Perakis and LCPC Gonski which "denied the presence of psychotic features"; and (4) inconsistent with the opinion of state agency consultant Dr. Mendoza. (R. 23-24). For the following reasons, the ALJ's reasoning in this regard is not supported by substantial evidence.

**1. Dr. Whyte's treatment notes reflect that Claimant had symptoms of psychosis.**

First, in finding Dr. Whyte's opinions inconsistent with her own treatment notes, the ALJ impermissibly played doctor. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Indeed, it is undisputed that throughout her treatment notes, Dr. Whyte indicated that Claimant was suffering from delusions on no less than seven occasions. (R. 902, 903, 904, 905, 906, 907, 908). On each such occasion, Dr. Whyte identified "delusions" as one of Claimant's "cognitive" symptoms, and often provided a further narrative description of those delusions. (*See, e.g.*, R. 904 (noting that Claimant's "delusions about her need for 10-12 hours of sleep per night prevent her from considering reasonable options for self-support"); R. 903 (observing that Claimant's "[d]elusional thought process makes normal functioning improbable at any future point.")).

Delusions *are* a symptom of psychosis. *See, e.g., Roytman v. Commissioner*, no. 19-CV-3626 (PKC), 2020 WL 5848615, at *2 n.6 (E.D.N.Y. Sept. 30, 2020) ("People who are experiencing psychosis may have either hallucinations or delusions.") (internal quotation marks omitted); *Uyremajesty El B. v. Commissioner*, No. 1:20-CV-06168-RGV, 2022 WL 16709726, at *12-13 (N.D.Ga. Sept. 30, 2022) (finding that claimant's " psychosis symptoms were delusions and rage or anger" and noting "that claimant displayed psychosis symptoms, such as reporting 'delusions about prosecution from government.'"); *Winkle v. Berryhill*, No. C17-1633 TSZ, 2018 WL 5669018, at *2 (W.D.Wash. Nov. 1, 2018) ("Examining physician R.A. Cline, Psy.D., diagnosed plaintiff with '[p]sychotic disorder' based on symptoms of '[d]elusional thought processes'"). Thus, the ALJ's finding that Dr. Whyte's office notes "do not document psychotic signs or symptoms," (R. 23), is incorrect.

The problem here is not that the ALJ overlooked the documentation of Claimant's delusions in Dr. Whyte's treatment notes; rather, the ALJ disagreed with Dr. Whyte regarding *what constitutes* a delusion. In particular, the ALJ implied that Dr. Whyte incorrectly classified Claimant's feelings about her future and her need to sleep at least ten hours as "delusions." (*See* R. 23 (commenting that "Dr. Whyte's records do not demonstrate psychosis; for instance, Dr. Whyte stated the claimant 'struggled with reality testing regarding her financial future' because she could not work because she was unsure how she would feel day-to-day."). But – as a non-medical professional – the ALJ was unqualified to determine what does and what does not constitute a delusion. Accordingly, the ALJ improperly discounted Dr. Whyte's opinions due to their alleged inconsistency with her own treatment notes, as her opinions regarding Claimant's delusions were in fact consistent with her notes. Simply put, the ALJ was not entitled to interpret Dr. Whyte's medical findings about what constituted "delusions" on her own. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.").

### 2. The ALJ's assessment of Claimant's treatment history was flawed and does not provide a sound basis for discounting Dr. Whyte's opinions.

As stated above, the ALJ found that Claimant had a "record of conservative treatment" and he discounted Dr. Whyte's opinions based on this finding. (R. 24). This was an error for several reasons. First, Claimant's mental health treatment – consisting of thirty-plus years of multi-weekly therapy sessions with multiple mental health professionals and a variety of medications – does not necessarily constitute "conservative" treatment. *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) (finding the ALJ was not competent to make the finding that if the claimant was as psychologically afflicted as his treating physician thought, he "would need to be institutionalized and/or have frequent inpatient treatment").

14

Second, even if it did, the ALJ was obligated to explain either why Claimant's conservative treatment was more consistent with Dr. Mendoza's findings, or what kind of alternative treatment would have been consistent with the findings of Dr. Whyte. *See Oakes v. Astrue*, 258 Fed.Appx. 38, 40 (7th Cir. 2007) (remanding where ALJ did not adequately explain why physician's recommendation of conservative treatment undermined his assessment of claimant's inability to work); *Leverance v. Astrue*, No. 09-C-559, 2010 WL 3386508, at *2 (E.D.Wis. Aug. 25, 2010) ("[T]he simple fact that [less conservative treatment] would not help Plaintiff does not mean her symptoms were not disabling, and to conclude otherwise (without more) is to 'play doctor.'"); *Cf. Diana S.*, 2022 WL 2316201, at *11 (finding the ALJ did not err in relying on the claimant's conservative treatment because "the ALJ contextualized her finding that Claimant's treatment was conservative by comparing it to other treatment options").

Finally, the ALJ's reliance on Claimant's allegedly "conservative" treatment was also improper because the ALJ failed to address *why* Claimant may have failed to pursue alternative treatment options, such as her distrust of physicians and her fear of medications (both of which stemmed from her mental impairments). (*See* R. 775) (Dr. Whyte treatment record indicating that Claimant has an "inability to trust the psychiatrists that are attempting to work with her" and "[s]hort medication trials typically fail as [Claimant] finds fault with the medication for a variety of reasons related to her delusional thought disorder")). This, too, was improper. *See* SSR 96–7P, 1996 WL 374186, at *7 (ALJs must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment"); *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (remanding to agency where ALJ made no attempt to determine the reason for conservative treatment).

### 3. The ALJ fails to account for the potential reasons why the treatment notes of Claimant's other treaters may not reflect the symptoms of psychosis that are reflected in Dr. Whyte's records.

Third, the ALJ discounted Dr. Whyte's opinions because they were inconsistent with the treatment records of Dr. Perakis and LCPC Gonski, who repeatedly indicated that Claimant was *not* experiencing delusions or other psychotic symptoms.[2]  (*See* R. 576, 578, 782, 784, 920, 922, 924, 926, 928, 930, 932).  But this purported inconsistency also fails to provide a persuasive reason to discount Dr. Whyte's opinions.  Not only do nine of the eleven treatment records from Dr. Perakis and Ms. Gonski fall well outside the timeframe during which Dr. Whyte documented delusions (November 2017-March 2018),[3] but the ALJ's reasoning in this regard "reveals an all-too-common misunderstanding of mental illness."  *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).  As the Seventh Circuit has repeatedly emphasized, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition."  *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing cases); *Stocks v. Saul*, 844 Fed.Appx. 888, 893 (7th Cir. 2021); *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016).

Here, the record before the Court reveals that Claimant, who has a well-documented diagnosis of depression and history mental illness, certainly suffers from good days and bad days.  Thus, it is not surprising that the two records from Dr. Perakis that fall within the same

---

[2] Notably, although Dr. Perakis' and Ms. Gonski's treatment notes do not reflect psychosis or delusions, even absent such symptoms, they too submitted opinions to the ALJ that Claimant's mental limitations would prevent her from performing full-time work.  (*See* R. 780 (Dr. Perakis opining that Claimant would be off task for more than thirty percent of the workday and absent from work more than six days per month); R. 915-16 (LCPC Gonski opining that Claimant's illness markedly restricts her daily activities, socialization, and the ability to sustain concentration and attention)).

[3] *See* R. 578 (dated 5/23/17); R. 576 (6/20/2017); R. 920 (6/12/18); R. 932 (10/8/2018); R. 930; (10/15/18); R. 928 (10/25/18); R. 926 (10/29/18); R. 924 (11/5/18); and R. 922 (11/12/18).

timeframe as Dr. Whyte's treatment records, (*see* R. 782 (dated 12/12/17) R. 784 (3/13/18)), fail

to reflect delusions or psychosis.[4]  *See Rosalyn L. v. Saul*, No. 3:19 CV 345, 2020 WL 614648, at

*10–11 (N.D.Ind. Feb. 10, 2020) ("[T]he implication from the ALJ's citation of a few positive

signs here and there in the treatment notes…ignores [the] variable and unpredictable nature [of

mental illness]."); *Van Buskirk v. Saul*, No. 18 C 8035, 2022 WL 475968, at *14 (N.D.Ill. Feb.

15, 2022) ("The court agrees that – absent further explanation – the ALJ's citation to a few

instances where [claimant] did not exhibit depressive symptoms does not mean that the treating

medical opinion was unsupported by the record."); *Louis P. v. Saul*, No. 18 CV 8486, 2020 WL

6044286, at *8 (N.D.Ill. Oct. 13, 2020) (citing *Rosalyn P.*).

Moreover, the ALJ's decision to discount Dr. Whyte's opinions because they are

inconsistent with the treatment records of LCPC Gonski is fatally flawed for two reasons.  First,

LCPC Gonski – as a licensed clinical professional counselor – is not "an acceptable medical

source under the regulations."  *Dante B. v. Kijakazi*, No. 20-CV-1104, 2022 WL 3926050, at 10

(N.D.Ill. Aug. 31, 2022) (citing 20 C.F.R. §404.1052(a)); *Ellen B. v. Saul*, No. 19-cv-2389, 2020

WL 1912228, at *8 (N.D.Ill. Apr. 20, 2020); *Compton v. Colvin*, No. 11 C 8305, 2013 WL

870606, at *10 (N.D.Ill. Mar. 7, 2013).  As such, LCPC Gonski is not an acceptable medical

source for purposes of establishing the existence/non-existence of an impairment or making a

diagnosis.  *Compton*, 2013 WL 870606, at *10 (citing cases).

Second, an ALJ must explain any weight that is given to the opinions of a non-acceptable

medical source with reference to the factors set forth in 20 C.F.R. §404.1527(c)(1)-(6).  *Id.*;

*Kevin B. v. Saul*, No. 19 C 1655, 2020 WL 2468131, at *11 (N.D.Ill. May 13, 2020); *see Swales*

---

[4] The fact that Claimant saw Dr. Perakis for only "about four minutes" per appointment, (R. 62), provides
an additional explanation for why Dr. Perakis did not observe any delusional thought patterns that
Claimant may have been experiencing.

*v. Saul*, 852 Fed.Appx. 253, 256 (9th Cir. 2021) (listing factors used to assess the weight to be given to non-acceptable medical sources).  The ALJ – who recognized that LCPC Gonski is not an acceptable medical source (R. 24) – did not explain why he decided to give LCPC Gonski's notations equivalent weight to those of Drs. Whyte and Perakis.  To the contrary, the ALJ determined that her treating source statement is entitled to "little weight."  (R. 24).  Given this finding, the ALJ's determination that LCPC Gonski's notes should be given equivalent weight to those of the physicians is unreasonable.

**4. The ALJ failed to adequately articulate his reason for discounting Dr. Whyte's opinions based on the opinion of Dr. Mendoza (the non-examining state agency physician).**

The Court further finds that the ALJ's reliance on Dr. Mendoza's opinion to discount Dr. Whyte's findings is not supported by substantial evidence given the rationale provided by the ALJ.  As the Commissioner notes, "it is perfectly acceptable to give more weight to a reviewing psychologist than a treating one when . . . the reviewing doctor's assessment is supported by and consistent with the record."  (Dckt. #24 at 9).  However, the ALJ is still obligated to minimally articulate *how* one assessment is better supported than the other.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007), *quoting Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ thus may discount a treating physician's medical opinion if it the opinion 'is inconsistent with the opinion of a consulting physician . . . as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'").

Here, rather than explaining how Dr. Whyte's opinion was "not supported by" the medical record, the ALJ simply deferred to *Dr. Mendoza's* finding that Dr. Whyte's opinion was not supported by the medical record – a finding that was also unexplained.  (R. 818) (Dr. Mendoza curtly dismissed Dr. Whyte's opinion as follows: "This is not supported by [the

medical record].").  This circular analysis – discounting Dr. Whyte's opinion because it was inconsistent with Dr. Mendoza's opinion which, in turn, discounted Dr. Whyte's opinion in a conclusory fashion – does not suffice.  *Cf. Kinnari A. v. Saul*, No. 29 C 760, 2020 WL 1863291, at *10 (N.D.Ill. Apr. 14, 2020) (finding no error where "[t]he ALJ adequately explained which portion of the consultative examiner's findings was inconsistent with [the treating physician's] opinion").

Furthermore, the ALJ failed to acknowledge evidence consistent with Dr. Whyte's mental RFC findings in the assessment of Dr. Whyte's 2018 opinion: namely, Dr. Perakis's findings that Claimant was severely limited in her ability to understand, follow, and carry out simple instructions; sustain an ordinary routine; work with others; perform without special supervision; interact appropriately with supervisors; and adapt to changes in the workplace.  (R. 24) (citing R. 779-80).  The ALJ was required to explain how this evidence factored into her assessment of Dr. Whyte's opinion.  *See, e.g., Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) ("[A]n ALJ may not ignore evidence that undercuts her conclusion."); *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014), *quoting Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("'it is equally clear that an ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.'").

Finally, the ALJ's separate assessment of Dr. Mendoza's opinion was similarly conclusory and does nothing to clarify the decision to afford his opinion more weight.  The only reason given by the ALJ for relying on Dr. Mendoza's findings was that they were "supported by the longitudinal, conservative mental health treatment record of outpatient counseling and medication maintenance."  (R. 23).  As explained in detail above in Section III(A)(2), the

purportedly conservative nature of treatment received by a claimant is not a reason, in and of itself, for crediting or discrediting the findings of a physician.

**5. The ALJ's failure to properly evaluate Dr. Whyte's opinion was not harmless.**

Furthermore, the ALJ's failure to properly evaluate Dr. Whyte's opinions was not harmless. "An error is harmless only if we are convinced that the ALJ would reach the same result on remand." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). If the ALJ had given more weight to Dr. Whyte's findings, Claimant's RFC would have likely been significantly more restrictive. For example, an RFC requiring more than fifteen percent off-task time could have changed the VE's opinion as to whether Claimant could perform any work. Thus, the Court is not convinced that a re-evaluation of Dr. Whyte's opinions would lead to the same non-disability finding, and remand is required.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #19), is granted, and the Commissioner's motion for summary judgment, (Dckt. #23), is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

**ENTERED:   March 31, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

20